# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>BLACK IN COLOR IPHONE LOCATED AT 1200 N.<br>PATTERSON AVENUE, WINSTON-SALEM, NC | )<br>)<br>)<br>)<br>)<br>)<br>Case No. 1:24MJ192-1 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution/Possession with Intent to Distribute Controlled Substances |
| 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Matthew La Valley
*Applicant's signature*

_____
Matthew La Valley/ Task Force Officer
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: _____ 05/20/2024 _____ 11:52 am

_____
*Judge's signature*

City and state: Durham North Carolina

Honorable Joe L. Webster, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Matthew La Valley, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

3. I am a police officer for the Winston-Salem Police Department (WSPD) and have been so employed since June, 2013. I am a graduate of the North Carolina Basic Law Enforcement Training taught by WSPD. I am also duly sworn as a Task Force Officer for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). During my career in law enforcement, I have participated in multiple advanced trainings to include the Police Law

Institute, Drug Investigations for Patrol Officers, Narcotic Investigation Techniques, Roadside Interdiction and Detecting Deception, Violent Criminal Apprehension Techniques, and Motorcycle Outlaw and White Supremacy Gangs.

4. I have spoken to, and worked with, more experienced federal, state, and municipal narcotics agents and officers. During the course of my employment as a law enforcement officer, I have participated in several investigations of illicit drug trafficking organizations involving the use of confidential informants, electronic and physical surveillance, the analysis of telephone toll records, investigative interviews, and the service of search and arrest warrants. These include investigations of the unlawful importation, possession with intent to distribute, and distribution of controlled substances, as well as the related laundering of monetary instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

5. I have been involved in the execution of numerous state and federal search warrants related to drug trafficking investigations. As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by traffickers and

2

trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances including through the use of vehicles.

6. My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following: (a) my own involvement in drug investigations and searches during my career as a law enforcement officer, as previously described; (b) what other agents and police officers have advised and related to me about the substance and results of their own drug investigations; and (c) other intelligence information provided through law enforcement channels.

7. The conclusions and opinions set forth below are based on my experience and training as a law enforcement officer, my direct participation in this investigation as described below, and conversations with other law enforcement officers who are familiar with the facts and circumstances of this investigation. The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation and through conversations with other federal, state, and local law enforcement officers and personnel. The following is not an exhaustive recitation of the facts agents and officers have learned during the course of this investigation but are the facts that I believe sufficiently establish probable cause. References

3

to law enforcement personnel in this case will generally be referred to as "agents" or "agents/officers," unless specified by name and agency.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8. The property to be searched shall be referred to as the "**TARGET DEVICE.**" **TARGET DEVICE** is an iPhone. A photograph of **TARGET DEVICE has** been attached to this application for further identification.

9. **TARGET DEVICE** is currently at the Winston-Salem Police Department Beaty Center, located at 1200 N. Patterson Avenue, Winston-Salem, North Carolina.

10. The applied-for warrant would authorize the forensic examination of **TARGET DEVICE** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

11. During October 2023, I received information from an ATF Confidential Informant (hereinafter "CI 1")[1], who I believe to be reliable and credible, provided information regarding DEQUAN DEONTE MOSES (aka Hatch). The CI advised that MOSES is involved in the distribution of large quantities of methamphetamine, fentanyl and heroin.

---

[1] The CI was compensated by ATF for his/her services and has a history of criminal convictions including felony convictions.

4

12.     I was able to query MOSES and observed he is a convicted felon, with convictions, including but not limited to, Robbery with a Dangerous Weapon, Kidnapping and Burglary. MOSES has served longer than one year of imprisonment for his convictions.


MOSES DL Picture

13.     On October 31, 2023, I contacted ATF CI 1 regarding arranging a narcotic transaction with MOSES for November 2, 2023. I instructed the CI to contact MOSES and request for one-half (1/2) pound of methamphetamine and one (1) ounce of fentanyl.

14.     The CI then called MOSES at XXX-XXX-2879 with TFO La Valley listening to the conversation. This phone call was not recorded.

15.     MOSES answered the CI's phone call, during which CI 1 advised CI 1 had a subject coming to town who was wanting to purchase methamphetamine and fentanyl. CI 1 requested one-half (1/2) pound of

5

methamphetamine and one (1) ounce of fentanyl, which MOSES agreed to selling for a combined price of $1,700.00. The two agreed to conduct the transaction on November 2, 2023. Additionally, MOSES agreed to meet the subject who was coming to town. After the transaction was arranged the phone call concluded. The subject CI 1 is introducing is an ATF Confidential Informant (hereinafter "CI 2")[2], who I believe to be reliable and credible.

16. On November 2, 2023, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agents and Task Force Officers conducted an undercover operation, in which ATF CI 1 and ATF CI 2 purchased approximately 220 grams of methamphetamine, 26 grams of heroin from Daquan MOSES at 105 Waughtown Street, Winston-Salem, North Carolina.

17. TFO La Valley and TFO VanKuren met with the CIs at a predetermined location and searched their person and the CI vehicle (CIV), no contraband was located. The CIs were provided prerecorded ATF Agent Cashier Funds.

18. TFO La Valley instructed CI 1 to contact MOSES and determine a location for the narcotic transaction. CI 1 made phone contact with MOSES at XXX-XXX-2879 (the same number utilized earlier). MOSES and CI 1

---

[2] The CI was compensated by ATF for his/her services and has a history of criminal convictions including felony convictions.

agreed to meet at 67 Waughtown Street, Winston-Salem, North Carolina (Valero Gas Station). MOSES and CI 1 agreed on a total price of one thousand, seven hundred dollars ($1,700.00).

19.    CI 1 and CI 2 were instructed by TFO La Valley to respond to 67 Waughtown in the CIV together and conduct the controlled purchase of one-half (½) pound of methamphetamine and one (1) ounce of fentanyl.

20.    At approximately 1:56 p.m., the CI's arrived in the CIV at 67 Waughtown Street and parked at the gas pumps.

21.    At approximately 2:09 p.m., CI 1 made phone contact with MOSES. MOSES advised he parked next to the "Fish Tables" building (105 Waughtown Street). MOSES requested the CIs park next to MOSES vehicle, at which time the CI's drove to MOSES location.

22.    The CIs then parked the CIV next to MOSES vehicle, identified as a silver in color Toyota Camry bearing New Jersey registration plate T41RYL. MOSES exited his vehicle and sat in the backseat of the CIV.

23.    Once in the vehicle, MOSES is seen reaching his hand in the front of the vehicle between the two front seats and handing apparent methamphetamine and fentanyl packaged in vacuum sealed bags to the CI's. CI 2 then handed MOSES the ATF Agent Cashier Funds.

7

24.    At the conclusion of the transaction MOSES returns to his vehicle and leaves the area.

25.    The CI's then drove to a predetermine location to meet with TFO La Valley. The CI and the vehicle were again searched with negative result for any contraband.

26.    This transaction was audio/video recorded and the funds used for the purchase were pre-recorded. ATF conducted a field-test of the suspected methamphetamine for the presence of a controlled substance and the field test provided a presumptive positive result for the presence of methamphetamine. ATF conducted a field-test of the suspected heroin for the presence of a controlled substance and the field-test provided a presumptive positive result for the presence of heroin. It should be noted that field-testing is a presumptive examination conducted prior to confirmatory laboratory analysis.

 

8

27.     The Drug Enforcement Administration (DEA) Laboratory conducted a forensic examination of the substance and determined it to be 219.29 grams of methamphetamine hydrochloride, with a purity of 78%, +/-5%. ATF conducted a field-test of the suspected fentanyl for the presence of a controlled substance and the field-test provided a presumptive positive result for the presence of heroin. It should be noted that field-testing is a presumptive examination conducted prior to confirmatory forensic laboratory analysis. The Drug Enforcement Administration (DEA) Laboratory conducted a forensic examination of the substance and determined it to be 26.86 grams of N,N-Dietheyl-2-(5-nitro-2-(4-propoxybenzyl)-1H-benzimidazol-1-yl)ethan-1-amine (Protonitazene)[3] and Xylazine.[4]

---

[3] Protonitazene is new potent synthetic opioid, and Schedule I controlled substance, with a potency and effectiveness that significantly enhances the risk of overdose and has increased mortality.

[4] Xylazine, also known as "Tranq" is not currently a controlled substance, however, the Drug Enforcement Administration notes that it is a powerful sedative that the U.S. Food and Drug Administration has approved for veterinary use and has been found in illicit mixtures with controlled substances, such as fentanyl. Such mixtures place users at a higher risk of suffering a fatal drug poisoning. Because Xylazine is not an opioid, naloxone (Narcan) does not reverse its effects. Injection of xylazine can also cause severe wounds, including necrosis—the rotting of human tissue—that may lead to amputation.

28. On November 10, 2023, TFO La Valley instructed ATF CI 1 and CI 2 make a three-way phone call with MOSES. The CIs proceeded to call MOSES at XXX-XXX-2879 (the same number previously utilized above). Upon MOSES answering the phone, CI 1 requested a pound of methamphetamine and one ounce of fentanyl. MOSES advised "that's a bet" and to let him know when the CI is ready.

29. On November 13, 2023, TFO La Valley instructed CI 1 and CI 2 make a three-way phone call with MOSES. The CI's proceeded to contact MOSES at 743-333-XXXX (the same number previously utilized above). Upon MOSES answering the phone, CI 1 advised that CI 2 wanted to meet at the same location as the previous transaction (105 Waughtown Street), which MOSES agreed, stating, "We can do that because I got to go to that side to grab it."

30. On November 13, 2023, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agents (SA) and ATF Task Force Officers (TFO) conducted an undercover operation, in which ATF CI 2 purchased approximately one ounce of suspected fentanyl from MOSES at 105 Waughtown Street, Winston-Salem, North Carolina. During this operation, surveillance would be maintained on 337 Strickland Avenue. During the

10

surveillance, multiple vehicles were observed coming and going from 337 Strickland Avenue.

31.    TFO La Valley instructed the CI 2 to drive to 105 Waughtown Street to meet with MOSES to conduct a prearranged fentanyl transaction.

32.    TFO La Valley and TFO VanKuren met with the CI at a predetermined location and searched their person and the CI vehicle (CIV), no contraband was located. At approximately 2:12 p.m., a subject is observed exiting 337 Strickland Avenue and getting into the driver's seat of the Toyota Camry. That subject then drives the Toyota Camry from the residence. The vehicle was confirmed to be bearing New Jersey registration T41RYL.

33.    Officers observed the Toyota Camry travel down Strickland Avenue to S. Main Street, this time turning north on Main Street. Officers followed the Toyota Camry to the point in which it arrived at 105 Waughtown Street, where the CI was located.

34.    At approximately 2:19 p.m., the Toyota Camry arrived at 105 Waughtown Street and the CI got into the front passenger seat of the suspect vehicle. Inside the Toyota Camry was MOSES. Once in the vehicle, the CI was provided the suspected fentanyl by MOSES and asked, "How much is that?" and MOSES responded, "11," meaning one thousand, one hundred dollars. The CI then provided MOSES with one thousand, one hundred

11

dollars of ATF Agent Cashier Funds. The CI asked MOSES how much the pound of methamphetamine will cost, which MOSES advised "22," meaning two thousand, two hundred dollars. MOSES then indicated he would contact his source for methamphetamine. MOSES then made an outgoing phone call to an unknown phone number however the call went to voicemail. MOSES stated, "He told me 3 o'clock, he got off at 2:30." The CI asked MOSES if he wanted to meet back up once he obtained the methamphetamine from the source which MOSES agreed.

35.    At approximately 2:21 p.m., CI 2 exited MOSES' vehicle and got back into the CIV and departed 105 Waughtown Street. At approximately 2:31 p.m., TFO La Valley and TFO VanKuren met CI 2 at a predetermined location. TFO La Valley recovered the purchased fentanyl from CI 2. Following the operation, the CI and the CIV were searched with negative result for any contraband.

36.    After the operation had concluded, surveillance was maintained at 337 Strickland Avenue, the Toyota Camry return to the residence and MOSES went into 337 Strickland Avenue.

37.    The suspected fentanyl was weighed, showing it to be approximately 26 grams.

38.    This transaction was audio/video recorded and the funds used for the purchase were pre-recorded.

39.    The DEA Laboratory conducted a forensic examination of the substance and determined it to be 25.99 grams of N-Phenyl-N-[1-(2-phenylethyl) -4-piperidinyl] propanamide (Fentanyl) (calc. as Hydrochloride), Xylazine and Dimethyl Sulfone.

40.    On November 13, 2023, ATF SA's and TFO's conducted an undercover operation, in which CI 2 purchased approximately one pound of suspected methamphetamine from MOSES in Winston-Salem, North Carolina.

41.    TFO La Valley and TFO VanKuren met with the CI at a predetermined location and searched their person and the CI vehicle (CIV), no contraband was located.

42.    TFO La Valley instructed the CI to drive to 3501 S. Main Street (Family Dollar) to meet with MOSES regarding the purchase of one pound of methamphetamine. MOSES had agreed to drive the CI to a source of supply for methamphetamine.

43.    During the controlled purchase, the CI was equipped with audio/video recording equipment. The surveillance units, observed and heard the following, transmitted via the surveillance recording equipment worn by

13

CI 2 and via ATF radio. Additionally, surveillance was maintained at 337 Strickland Avenue, Winston-Salem, North Carolina during the duration of the operation.

44.     At approximately 3:52 p.m., MOSES is seen exiting the front of 337 Strickland Avenue and getting into the Toyota Camry (New Jersey Registration T41RYL). MOSES is then seen by officers driving down Strickland Avenue to the intersection of Strickland Avenue and S. Main Street and pulling into the parking lot of 3501 S. Main Street.

45.     At approximately 3:54 p.m., the CI exited the CIV and sat in the front passenger seat of MOSES's Toyota Camry. MOSES then drove the Toyota Camry out of the parking lot, south on S. Main Street and then east onto Clemmonsville Road. MOSES then drove north on US 52, exiting on US-421 southbound and exited off the Lowery Street exit. MOSES then drove to Hicks Street and parked.

46.     During the drive to Hicks Street, MOSES was on the phone with an unknown subject. MOSES asked the male subject, "Where the hell you at bro?" to which the male responded, "Over here on Silas Creek. I had to find someone to go damn weigh this shit." The male subject on the phone then talked about how he could not get off work, which was the reason the methamphetamine was not available earlier. The subject then stated, "I gotta

14

get off work, go all the way to the west side, grab the shit and then meet you bro." The phone call ended at approximately 3:57 p.m.

47. At approximately 4:01 p.m., the CI asked MOSES if the "clear be good from old buddy," which MOSES confirmed stating it was one of his "homies." MOSES then received an incoming phone call, and upon answering it he requested the unknown subject on the other line to send him their location. MOSES then told the subject to meet on the same street "as last time" and that MOSES was currently on Lowery Street.

48. At approximately 4:03 p.m., MOSES parked his vehicle in the 100 block of Hicks Street, Winston-Salem, North Carolina. MOSES then exited the vehicle and met with the source of supply.

49. At approximately 4:06 p.m., MOSES returned to his vehicle and provided the CI with the suspected methamphetamine. The CI then provided MOSES with two thousand, two hundred dollars of ATF Agent Cashier Funds. MOSES then began driving the vehicle from the area.

50. At approximately 4:21 p.m., MOSES arrived at 3501 S. Main Street, where he dropped the CI off. The CI then entered the CIV. MOSES was observed leaving the parking lot, driving onto Strickland Avenue.

51. At approximately 4:22 p.m., MOSES arrived back at 337 Strickland Avenue and went into the residence.

15

52.    TFO La Valley and TFO VanKuren met CI 2 at a predetermined location. TFO La Valley recovered the purchased methamphetamine from CI 2. Following the operation, the CI and the vehicle were again searched with negative result for any contraband.

53.    This transaction was audio/video recorded and the funds used for the purchase were pre-recorded.  ATF conducted a field test of the suspected methamphetamine for the presence of a controlled substance and the field test provided a presumptive result for the presence of methamphetamine.  It should be noted that field testing is a presumptive examination conducted prior to confirmatory forensic laboratory analysis.

54.    The DEA Laboratory conducted a forensic examination of the substance and determined it to be 445.9 grams of methamphetamine hydrochloride, with a purity of 93%, +/- 6%.

55.    On March 27, 2024, I was informed that members of the Winston-Salem Police Department had executed a search warrant at 2721 Bridgeport Drive, Winston-Salem, NC and had MOSES, Subject 1, and Subject 2 in custody. All three subjects were transported to the Winston-Salem Police Department Public Safety Center (PSC) and placed in individual interview rooms. I responded to PSC to assist in interviewing the three arrestees.

56. Prior to conducting any interviews, I was informed that during the execution of the search warrant, officers located multiple empty baggies containing apparent methamphetamine residue, as well as paraphernalia consistent with the manufacturing, packaging, and processing of suspected fentanyl/heroin. Additionally, a firearm was located on the living room couch inside the residence.

57. Officer Teague and I then attempted to interview MOSES. I advised MOSES of his *Miranda* Rights, which MOSES waived and agreed to answer questions.

58. It should be noted MOSES was wearing the same jacket in the interview room as he was during November 13, 2023, controlled buy.

59. MOSES denied knowing that there were drugs in the house where he had been arrested. Moses also denied knowing about Subject 1 or Subject 2's involvement in drug distribution.

60. MOSES stated he was leaving the residence and was out by the car in the driveway to take the female home when police approached the residence, and he was detained.

61. I informed MOSES I had additional matters I wanted to speak to him about. MOSES was informed that he has been the subject of an investigation regarding firearms, methamphetamine, and fentanyl.

17

Additionally, I told MOSES that I know he sells methamphetamine and fentanyl. MOSES was then told that law enforcement had purchased trafficking quantities of narcotics from him.

62.    I asked MOSES if he knows Subject 3, which he confirmed. Moses admitted getting "ice" (methamphetamine) from Subject 3. I asked MOSES "How much do you sell an ounce of fentanyl for," which MOSES stated, "It depends, people be stretching dope." MOSES then stated, "I don't sell much of that shit." MOSES was then asked, "What is your lane then," which MOSES stated his lane is any way to make money. MOSES then stated a pound (referring to methamphetamine) is not a large quantity due to it being so cheap. I asked MOSES what would be found in his cell phone, he advised pictures of "dope" and guns.

63.    On April 5, 2024, I obtained a search warrant signed by U.S. Magistrate Judge L. Patrick Auld for the cell phone that had been seized from MOSES. This search warrant was subsequently executed; however, the iPhone was not able to be unlocked and an extraction could not be conducted.

64.    On May 1, 2024, TFO La Valley obtained a Federal Warrant for Arrest for MOSES in relation to the Distribution and Conspiracy to Distribute Methamphetamine.

65.     On May 2, 2024, officers with the Winston-Salem Police Department located and arrested MOSES at 1804 N. Patterson Avenue. At the time of his arrest, MOSES had the TARGET DEVICE in his hand and officers advised witnessing MOSES throw what would later be determined to be approximately two ounces of methamphetamine under a vehicle in the parking lot. The TARGET DEVICE and methamphetamine were seized by law enforcement.

66.     Based on my training, experience, and knowledge of this case, I know that drug traffickers regularly communicate utilizing cellular telephones, such as **TARGET DEVICE**, to coordinate drug transactions with drug customers and drug sources of supply. Additionally based on my training, experience, and knowledge of this case, I know that MOSES uses digital devices to coordinate drug sales, drug shipments, discuss the transfer of drug proceeds. It is my belief that MOSES will have additional communication within **TARGET DEVICE** regarding drugs and/or money transactions.

67.     Based on the information provided in this application, I submit there is probable cause to believe **TARGET DEVICE** will contain evidence of drug trafficking conducted by MOSES and co-conspirators both known and unknown to law enforcement. **TARGET DEVICE** is currently stored at the

Winston-Salem Police Department Beaty Center, located at 1200 N Patterson Avenue, Winston-Salem, North Carolina.

68. In my training and experience, I know that **TARGET DEVICE** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as it was when **TARGET DEVICE** first came into the possession of the Winston-Salem Police Department.

<u>Technical Terms</u>

69. Based on my training and experience, I use the following technical term to convey the following meanings:

> Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

70. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

71. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **TARGET DEVICE** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **TARGET DEVICE** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is

analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a cellular telephone is evidence may depend on other information stored on the cellular telephone and the application of knowledge about how a cellular telephone behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

72. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the

examination of **TARGET DEVICE** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of **TARGET DEVICE** to human inspection in order to determine whether it is evidence described by the warrant.

73. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

74. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **TARGET DEVICE** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

/s/ Matthew LaValley
Matthew La Valley
ATF Task Force Officer
Bureau of Alcohol, Tobacco,
    Firearms and Explosives

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 20th day of May, 2024, at 11:52 a.m.

Honorable Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

24

## ATTACHMENT A

The property to be searched is as follows:

a.  **TARGET DEVICE**: A black in color iPhone with a black case



**TARGET DEVICE** is currently at the Winston-Salem Police Department Beaty Center, located at 1200 N. Patterson Avenue, Winston-Salem, North Carolina.

This warrant authorizes the forensic examination of the **TARGET DEVICE** for the purpose of identifying the electronically stored information described in Attachment B.

25

## ATTACHMENT B

1.      All records on the **TARGET DEVICE** described in Attachment A that r involving violations of 21 U.S.C. §§ 846 and 841 (conspiracy to commit possession with the intent to distribute and to distribute a controlled substance and possession with the intent to distribute and to distribute a controlled substance); and involve MOSES in the form of:

   a.      Electronic communications between MOSES and others regarding the purchase, possession or transfer of controlled substances.

   b.      lists of customers for controlled substances and related identifying information;

   c.      types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   d.      any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   e.      all bank records, checks, credit card bills, account information, and other financial records

   f.      photographs, videos or other records depicting controlled substances.

26

2.     Evidence of user attribution showing who used or owned the **TARGET DEVICE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.